```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
BRUCE COLEMAN AND ROCHESTER AUTO
MAINTENANCE, INC.,

                        Plaintiffs,           07-CV-6117
            v.                              DECISION AND ORDER

ATLANTIC RICHFIELD COMPANY,
BP OIL CORPORATION,
UNITED REFINING COMPANY OF
PENNSYLVANIA, AND JOHN DOES

                        Defendants,
_____
```

## INTRODUCTION

Plaintiffs, Bruce Coleman ("Coleman") and Rochester Auto Maintenance, Inc. ("Rochester Auto") (collectively, "Plaintiffs"), bring this action for damages, reimbursement and/or contribution for environmental response costs relating to environmental contamination at 2472 Monroe Avenue, in the Town of Brighton, New York (the "Site"). Plaintiffs allege causes of action under New York Navigation Law and for negligence, public nuisance, implied indemnification and restitution. Defendants United Refining Company ("URC"), Atlantic Richfield Company ("ARCO"), and BP Oil Corporation ("BP")[1] (collectively, "Defendants") now move for partial summary judgment arguing that the Plaintiffs can not recover lost profits based on a lost sale of the Site.[2] Defendant

---

[1] BP Products North America, Inc. was incorrectly sued as BP Oil Corporation.

[2] URC also contends that Plaintiffs' damages should be limited for other reasons. However, such arguments are beyond the scope of this motion, which the parties agreed would

URC also argues that its liability is limited by a Bill of Sale and Release (the "Release") entered into by Coleman and URC when Coleman purchased the Site from URC in April 1985.

For the reasons set forth below, URC's motion for summary judgment based on the Release is denied. URC, ARCO and BP's motion for summary judgment on the issue of lost profits is granted. Accordingly, Plaintiffs' claim for lost profits is dismissed with prejudice.

**BACKGROUND**

History of the Site and Sale to Coleman:

ARCO owned the Site from approximately 1936 to 1970 and BP owned the Site from 1970 to 1971, during which time both ARCO and BP operated the Site as a gasoline service station.[3] URC owned, operated and supplied gasoline to the site from 1971 until 1985, when it sold the site to Coleman.

Coleman purchased the Site from URC by Warranty Deed and a Release on April 2, 1985. The Release applied to the purchase of "[a]ll personal property of the Seller [URC]", and specifically included and excluded certain pieces of personal property from the definition of personal property contained in the Release. The definition of "all personal property" specifically includes "three

---

be limited to URC's liability under the Bill of Sale and Release and Plaintiffs' ability to recover lost profits. (Docket No. 45.)

[3]The facts are taken from the parties' submissions pursuant to Local Rule 56 (a). (Docket Nos. 53, 57 and 78).

10,000 gallon underground storage tanks". The Release also provides as follows:

> It is understood that in the sale of this property, there are no WARRANTIES OF MERCHANTABILITY, there are no warranties which extend beyond the description on the face hereof, and this property is sold as is and with all faults.
>
> It is further understood that the above described equipment was formerly used for the storage and/or handling of gasoline or other petroleum products....
>
> Purchaser as part of the consideration for this sale, hereby fully releases and forever discharges [URC, its] successors and assigns, from any and all actions, causes of action, liability claims and demands whatsoever arising out of the ownership, possession, use or installation of the above described property. Purchaser further agrees to indemnify and hold [URC, its] successors and assigns, harmless from any and all liability for damages and losses of any kind, to person or property, caused in any manner by the ownership, use or installation of the above described property.

URC Exhibit J (Docket No. 53-12)(emphasis added).

Coleman did not intend to use the three underground storage tanks that were included within the definition of the purchased property in the Release. Although he agreed to purchase the three underground storage tanks, he planned to remove the tanks and construct a building on the Site.

Four underground storage tanks were eventually discovered and removed in November 1985 during Coleman's construction of a Jiffy Lube, which opened in 1986. Plaintiff, Rochester Auto, operated

the Jiffy Lube at the Site from 1986 through 2004. The tanks appeared to be in good condition when they were removed, but petroleum stained soil was also found and removed with the tanks, as required by the Monroe County Department of Health. Plaintiff was not aware of any further contamination, including groundwater contamination.

Sale to Eureka Petroleum, Inc.

In 2003, Coleman was approached by Paul Morabito about purchasing the Jiffy Lube business from Rochester Auto. At the time, Coleman owned several Jiffy Lube locations, and Morabito proposed that his company, Eureka Petroleum, Inc. ("Eureka"), purchase Coleman's six Jiffy Lube businesses in the Rochester area. For the six businesses, including real estate and buildings, Eureka agreed to pay $7,500,000, $1,672,958 of which was specifically allocated to the Jiffy Lube site which is the subject of this lawsuit. Coleman and Eureka signed a Letter of Intent to this effect on November 7, 2003. Coleman characterized the sale as "well above true market or appraised value." The last appraisal for the Site before that time was in 1994, which valued the Site at $680,000.

Eureka and Coleman began to negotiate a formal purchase agreement, and Eureka engaged Teeter Environmental Services, Inc. ("Teeter") to perform a phase II environmental assessment of the Site. Teeter reported significant petroleum contamination

including groundwater and soil contamination. Based on this report, Eureka refused to purchase the Site, and two other properties that were also contaminated. Eureka agreed to lease the Site and the other two contaminated properties (through an affiliate - Monroe Petroleum, LLC) and purchase the non-contaminated properties at the previously agreed upon price. The Lease Agreement with Monroe Petroleum provided that the Site would be purchased if it was remediated and Coleman received a "no further action letter" from the New York State Department of Environmental Conservation ("NYSDEC") within 10 years. The lease was executed on March 8, 2004 and provided for a thirty year term with an option to renew.

After entering into the lease, Coleman engaged Soil Air and Water Environmental Services ("SAW") to remediate the Site. SAW presented two options to Coleman - (1) installation of a dual phase extaction system or (2) the complete excavation and off-site disposal of the contaminated soil. Based on the lease with Monroe Petroleum, Coleman chose to install the extraction system, because excavation would cause a disruption to the operations of Monroe Petroleum. Plaintiffs state that such disruptions were prohibited by the lease which required them to "use [their] best efforts...to minimize disruption" to the Site. The projected timeline for the remediation was a minimum of two years.

The remediation system was put in place in March 2006, but due to a billing dispute with SAW, the remediation system was shut down from June 2006 through August 2007. Plaintiffs state that despite this setback, remediation was eventually resumed. The NYSDEC approved the shutdown of the system in December 2010 because it was not fully successful. Other methods of remediation have been undertaken, but, as of the filing of the instant motion, the remediation was still not completed.

In late 2006, DDS Management LLC ("DDS") purchased Eureka and its affiliates and assumed responsibility for leasing the Site. DDS continued to pay rent to Coleman for the Site until it filed for bankruptcy in late 2007 or early 2008. Coleman then evicted DDS from the Site. The lease provision that required DDS to purchase the Site, provided that Coleman completed the remediation within 10 years, was, therefore, not realized due to DDS's bankruptcy and eviction from the Site.

Coleman did not attempt to sell the property to another buyer, but leased portions of the property to an adjacent business for parking and to several cell phone companies for cell towers. In late 2011, Plaintiff leased the Site to Valvoline Instant Oil Change. There is also no evidence in the record that a sale of the Site is not possible due to the contamination - notwithstanding the fact that Eureka refused to purchase the Site before it was

remediated - and Plaintiff admittedly has preferred, for various reasons, to lease the Site.

## **DISCUSSION**

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. See Scott v. Harris, 550 U.S. 372, 380 (2007). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. See Id. at 380 (citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587).

A.  The Release

URC argues that it is entitled to summary judgment on all of Plaintiffs' claims based on the Release, which specifically states: "Purchaser...hereby fully releases and forever discharges [URC, its] successors and assigns, from any and all actions, causes of action, liability claims and demands whatsoever arising out of the ownership, possession, use or installation of the above described property."  It contends that this language is broad enough to encompass any and all liability related to environmental

contamination that may have occurred prior to the sale of the Site to Coleman based on its use as a gasoline service station. URC Mem. of Law at 10-14, Docket No. 54.

Plaintiffs argue that summary judgment is inappropriate because the Release only exempts URC from liability arising out of Coleman's "ownership, possession, use or installation" of the property covered by the Release, namely the three underground storage tanks, and does not cover any liability arising out of events that may have occurred while URC owned the Site. Pl. Mem. of Law at 5-15, Docket No. 66. Plaintiffs also argue that the origin of the contamination is unknown and that it could have originated from property that is not covered by the Release, for example, the fourth underground storage tank that was discovered on the property.

URC responds that the Release insulates it from liability related to its operation of the Site as a gasoline service station because Coleman was aware at the time of the sale that the Site was operated in this manner and that the underground storage tanks contained gasoline and were used to facilitate the operation of the gasoline service station. URC further argues that the inclusion of the word "installation" in the language of the Release unambiguously establishes the parties' intent that the Release cover liability arising out of the "ownership, possession, use or installation" by URC, as the underground storage tanks were already

installed at the time of Coleman's purchase. URC Reply at pg. 2-7, Docket No. 70.

The Court must construe the Release to give meaning to the contract as a whole and give effect to the parties' intention, as it can be ascertained from document itself. See e.g. Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 324-325 (2007). While contracts to indemnify are strictly construed in New York, where the parties clearly intend to allocate liability for environmental damage, the Court will enforce the contract. See e.g. Buffalo Color Corp. v. Alliedsignal, Inc., 139 F.Supp.2d 409, 419-420 (W.D.N.Y. 2001).

The Court finds that the Release, which states that Coleman "fully releases and forever discharges [URC, its] successors and assigns, from any and all actions, causes of action, liability claims and demands whatsoever arising out of the ownership, possession, use or installation of the above described property", is broad enough to include liability for environmental contamination arising out of the "ownership, possession, use or installation" of the purchased property. See Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 15-16 (2d Cir. 1993)(contract to indemnify for "*all liabilities* and indebtedness of Olin related to its [aluminum business]" sufficiently broad to include liability for environmental damage); cf. Buffalo Color, 139 F.Supp.2d at 420-425 (finding no duty to indemnify where contract

limited indemnification to specific liabilities, which were not broad enough to include environmental contamination).

The Court also finds that the Release is unambiguous in providing for a release of liability for URC's "ownership, possession, use or installation" of the property, including for leaks that may have occurred due to URC's use or ownership of the three underground storage tanks that are included within the definition of property. It is undisputed that the underground storage tanks were installed prior to Coleman's purchase of the Site and the property described in the Release. The specific inclusion of the phrase "installation of the above described property", therefore, unambiguously relates back to the date that the underground storage tanks were installed. Accordingly, the Court finds that the Release covers liability related to both Coleman's and URC's ownership, possession, use or installation of the property. Cf. New York v. Tartan Oil Corp., 219 A.D.2d 111, 114-5 (3rd Dept. 1996)(finding that the contract only included indemnification for prospective oil leaks where it stated that leaks "may" occur and that Tartan would indemnify the previous owners for such leaks, but the contract did not contain any language relating to a past leak or the past conduct of the previous owners).

However, while the Release covers liability for environmental contamination that may have occurred during the time when URC owned

the Site, the Release does not insulate URC from liability related to its ownership or use of other property that is not specifically covered by the Release. The property covered by the Release is defined as: "all personal property of the Seller" and then it excludes and includes certain items within the meaning of "all personal property". Specifically, it includes "three 10,000 gallon underground tanks". Because the phrase "all personal property of the Seller" is qualified by a list of specifically included and excluded pieces of personal property, the Court finds that the Release is not broad enough to insulate URC from liability for other, unspecified, property, particularly the fourth underground storage tank. If the parties intended to include other property within the Release, they would have done so; rather, the parties qualified the definition of personal property to include "all personal property of the Seller" with a list of included and excluded property. This is clearly indicative of their intent to include only "three 10,000 gallon underground tanks" within the definition of "all personal property" applicable to this Site. Further, had the parties intended the Release to cover all liabilities stemming from the Site's use as a gasoline service station, the Release could have been drafted to reflect that intent. See Beal, 8 N.Y.3d 318, 324 (a court must give meaning and effect to the contract as a whole); see also Omni Berkshire Corp. v. Wells Fargo Bank, N.A., 307 F.Supp.2d 534, 540 (S.D.N.Y. 2004)

("A contractual provision should be read so as to avoid rendering any part of the contract superfluous or without effect."). This conclusion is further supported by the fact that contracts to indemnify in New York must be strictly construed. See Tartan, 219 A.D.3d at 115 (citing Hooper Assocs. v. AGS Computers, 74 N.Y.2d 487, 491 (1989).

The parties agree that a fourth underground storage tank was found during excavation of the Site by Coleman in 1985. The parties also agree that the origin of the leak that created the contamination is unknown. Accordingly, the Court finds that there are material issues of fact with respect to whether URC is released from liability for the environmental damage to the Site, because the damage could have been caused by property that was not included within the Release, for example, the fourth underground storage tank.[4] Therefore, URC's motion for summary judgement in its favor based on the Release is denied.

B. <u>Lost Profits</u>

Defendants URC, BP and ARCO contend that Plaintiffs' claim for lost profits because of the failed real estate transaction between Coleman and Eureka is too speculative because, among other reasons, he still owns the Site and he could sell it for profit at any time.

---

[4]Plaintiffs submit evidence of other potential sources of contamination in an effort to create a material issue of fact. However, because the Court has found that the existence of a fourth underground storage tank which was not covered by the Release is sufficient to create a material issue of fact, the Court need not determine whether Plaintiff has presented other material issues of fact with respect to this discrete issue.

Moreover, they contend that he is limited to recovering damages for injury to real property or remediation costs. Defendants, BP and ARCO also argue that Plaintiffs have not presented evidence of loss of value in the Site, but this argument is outside the scope of this motion, which the parties agreed would be limited to whether Plaintiffs could recover lost profits based on the lost sale to Eureka in 2004. (Docket No. 45.)

Plaintiffs argue that the requested damages are not too speculative and the agreed upon sale price for the Site ($1,672,958) is sufficient evidence of their lost profit. Plaintiffs also argue that the sale was not completed due to the contamination and that the circumstances that prevented realization of the lease provision requiring Monroe Petroleum to purchase the remediated property were out of their control. Lastly, they contend that they were not required to mitigate their damages by selling the Site at a time when "[t]here was no market for the Site" - during the current economic crisis.

Both parties cite <u>Amco Intl., Inc. v. Long Island Railroad Co.</u>, 302 A.D.2d 338 (2nd Dept. 2003) and <u>Steitz v. Gifford</u>, 280 N.Y. 15 (1939), to support their respective positions as to whether Plaintiffs are entitled to "lost profits" from the failed 2004 sale to Eureka. In <u>Amco</u>, the court held that lost profits were recoverable where plaintiffs were prevented from installing silos to store inventory on contaminated property and incurred lost sales

as a result. The plaintiffs in Amco introduced evidence of prior sales to establish the amount of profits lost over the period in question. 302 A.D.2d at 340. In Steitz, the plaintiff was entitled to recover lost profits which were calculated as the difference between the price actually received for produce on the open market and the price he would have received under contracts he held to sell his produce, because he could not sell the produce at the contract price due to an accident for which the defendant admitted liability. 280 N.Y. at 19-22. The plaintiff in Steitz produced evidence of lost profits based on its sale of produce from the property at a loss.

In both Amco and Steitz, the "lost profits" were based on the sale of goods, or the lack of sales, the amount of which could be reasonably determined based on prior sales or the actual sale of the goods at a loss. Here, Plaintiffs have not sold the Site at a loss compared to the price offered by Eureka in 2004. Plaintiffs also have not shown that they would have sold the Site to another buyer, but for the contamination. And significantly, Plaintiffs admit that since the bankruptcy of DDS, they have preferred to lease the Site rather than sell it.

Even accepting the argument that, but for the contamination, the sale to Eureka would have been completed, Plaintiffs have not offered evidence of the existence of an actual sale of the Site or even a proposed sale from which the Court could determine whether

Plaintiffs have actually incurred a loss. Plaintiffs have not attempted to sell the Site since 2004 and offer no information regarding whether the market value of the Site has decreased such that the Site could not be sold, either for profit or at a loss. Plaintiffs have not cited, and the Court has not found, any legal authority to support their lost profits theory. The Court finds, therefore, that a claim for lost profits is not the proper measure of damages in this case. Accordingly, Plaintiffs' claim for lost profits is dismissed with prejudice.

## **CONCLUSION**

For the reasons discussed herein, the Court denies URC's motion for summary judgment based on the Bill of Sale and Release, as there are material issues of fact with respect to the source of the contamination and whether it is covered by the Release. The Court grants Defendants' motion for summary judgment with respect to Plaintiffs' claim for lost profits, which constitute an inappropriate measure of damages in this case. Plaintiffs' claim for lost profits is therefore dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

                                                   S/ MICHAEL A. TELESCA
                                                   HON. MICHAEL A. TELESCA
                                                   United States District Judge

Dated:    Rochester, New York
             October 24, 2012